50 Can you pull me a bull? Thank you, Mr. Chairman. Mr. Adelman? Good morning. May it please the Court, Andrew Adelman on behalf of Markham. The Claims Court's decision stands for the proposition... May I ask you a question about what's going on here? Yes, Your Honor. Because I'm not clear about it from the briefs. As I understand it, Chief Judge Jones acted on the September, October, and November vouchers or claims. And have you been paid that money that she allowed with respect to those claims? The $205,000? Yes. Yes, Your Honor. So after she ordered you to continue, there were claims for December, January, and February. Am I correct about that? There were claims that were submitted to the District Court. Yes, Your Honor. And what's happened to those? Some of the money has been paid, but in sum, based on all the vouchers that have been submitted, both for the pretrial work and the trial work, there was over a million dollars in fees that went unpaid to Markham. But what is... I guess what I'm trying to get at is, are the proceedings still pending with respect to the December, January, and February claims, or is that all over with? That's all over with. And so part of that was certified by the District Court, and then the Chief Judge of the Fifth Circuit approved the payment of that? That's correct. And how much was that? How much was the payment? Yeah. Your Honor, I don't have that number specifically with me. I believe we may have dealt with it in the briefs. I don't think so, but maybe. No, you didn't. You say that there's over a million dollars due, and is that due based on the shortfall of your budget? In other words, you had a $3.2 million budget. Are you saying that there was $2 million total paid? No, the number has nothing to do with the budget. The budget was a forecast that was submitted to the District Court multiple times and approved by the District Court. But for the approval of those budgets, Markham wouldn't have started working in the first place. And that's really what leads us to this place, is that the District Court approves these budgets. The original budget was for $4.5 million. The second budget was for $3.2 million, give or take. The District Court approved both of those budgets, allowed Markham to start working. Was the $3.2 a reduction from the $4.5? Correct. Or were they two different phases? Correct. No, it was a reduction. There was never $4.5 million that was paid to Markham. Markham submitted an original budget, was ahead of schedule by the time it got around to submitting its subsequent budget, did so, the second budget was approved by the District Court, and Markham worked. And it wasn't until the time that Markham was awaiting payment in December that Chief Judge Jones came around and gave the haircut that we're here talking about. Now, when you say that she came around and gave the haircut, part of the problem was that she did not give you advanced approval. And while the District Court did, the rules, the TJA rules specifically state that advanced approvals should be sought from both the trial judge and the Chief Judge of the Circuit. Isn't that true? I don't know if I would read the statute that way, Your Honor. I don't know if the statute would have required Markham to have sought approval in advance of doing the work from the Chief Judge. And I can point to that language in 3006A. All it indicates is that the amount of the excess payment is approved by the Chief Judge of the Circuit, but it doesn't indicate, the statute doesn't indicate when that approval needs to be sought. It doesn't specifically say that the approval needs to be sought in advance of doing the work. I think if the statute would have said that, defense counsel working with the District Court clearly would have gone and sought that approval. But the guidelines that interpret application of the statute and suggest how it should be, the Fifth Circuit guidelines actually suggest that pre-approval. Do they not? Again, I don't know if it's required. And even if it was required, I don't know if I would put that on Markham. Markham sought the relief from the District Court. The District Court, excuse me, sought approval from the District Court. District Court gave the approval and told Markham to start working, and it did. In a case that was in front of the District Court. If the Fifth Circuit rules or the guidelines... Well, it's the guidelines for the administration of the CJA and related statutes. It's the Guide to Judiciary Policy, Chapter 3 says, if it can be anticipated that the compensation will exceed the statutory maximum, advance approval should be obtained from the court and the chief judge of the circuit, or the active or senior circuit judge to whom excess compensation authority has been delegated. It does specifically say you should go get advance approval, right? Well, it should. Correct. It certainly says should. I don't know if that is mandatory on Markham, and if it's mandatory at all, I don't know if that would flow all the way down to Markham. Markham was communicating with the District Court through Defense Council. District Court was communicating with the... I'm sorry, the Defense Council was communicating with District Court. The District Court gave the approval and told Markham to start working. Whether all of this down the road results in the chief judge of the circuit disapproving for no apparent reason over a million dollars in fees to Markham, I don't know if any of that is reflective on anything that Markham did or didn't do. Well, you say, denied a million dollars in fees without explanation. We haven't seen the order with respect to the December, January, and February bills. In fact, I don't even think we have the complete order with respect to the September, October, and November bills, but what did Chief Judge Jones say in reducing your compensation for December, January, and February? What were the grounds? There were no grounds. The grounds were simply the money that I'm approving here, the $205,000 is enough. No, no, you're confused. I'm asking about the December, January, and February. I see. What did she say when she reduced the amount of the claims with respect to those months? We have nothing. There's nothing from Chief Judge Jones indicating how much money should be paid and why. Well, wait, I'm confused. I thought you said you did get money for the December, January, and February bills. Correct. How did you get that? Well, there were vouchers that were submitted to the district court, and then there were communications between the district court and Chief Judge Jones. So she approved some sort of payment, right? That's correct. And how much did she reduce the bills? Again, Your Honor, I'm not exactly sure how much those latter bills were reduced, but again, there were, in sum, between the pre-trial work and the trial work, it was a reduction of approximately a million and two. Did the trial court request the excess compensation? The approval? Yes. That's my understanding, yes. Okay, well, at least the way we always did it in Northern District, Ohio, is we wrote letters copying the counsel saying, we request excess compensation. Did you receive a copy of a letter from the trial court? From the trial court? No, Your Honor, nothing like that. So you don't know whether the trial court actually asked for the excess compensation? I'm assuming that there was a request made because there were payments made, but as far as the communications between the district court and the chief judge, I don't know what happened there. The district court didn't tell you whether it was certifying the full amount of your claims for December, January, and February? No. Again, this was after the trial would have happened, by the time all that came around. There were no communications of that nature between the trial court and defense counsel. Mr. Edelman, before we can even get into these details, you have to get around Sheeran, don't you? Oh, sure. So how do you do that? Well, Sheeran is a very different case. It stands on a very different procedural posture than this case does. As far as that the CJA preempts the Tucker Act, doesn't that dispose of this case? I wouldn't agree that that case says what Your Honor credits it in saying so explicitly, that the CJA outright displaces the Tucker Act. Again, in the Sheeran case, you had a criminal defense attorney working on an appeal before the Third Circuit, and had 45 days to submit her vouchers to be approved. Waited over a year to submit those vouchers, and when they were denied by the Third Circuit, collaterally attacked them in the claims court. But as far as I can tell from the Sheeran decision, it wasn't a takings case. It was just a collateral attack on the decision. And we said that Congress placed jurisdiction for Criminal Justice Act fees with the presiding tribunals, not here. Isn't that a pretty clear indication that you don't belong here either? Well, what's different between us and the Sheeran case is that we're pursuing this as a takings claim. Mrs. Sheeran never argued that there was a taking that occurred. Why does that make a difference? It makes a fundamental difference because that's what gives the claims court jurisdiction, as opposed to just filing an appeal. And that's really what all of the different cases dealing with these aspects of the CJA talk about. The Second Circuit, the Third Circuit, the Sixth Circuit, the Seventh Circuit, they say, we don't have jurisdiction to hear these as appeals. And we're not pursuing this as an appeal. We're pursuing this as a takings case. Your argument that the right to relief arises directly under the Constitution and not under the CJA? That's exactly right. Do you think that there is a potential distinction between any claims you might have for work that was done up through November before the court issued the show cause order, and any claims you might have for essentially being conscripted to continue working? Well, I don't believe that we can compartmentalize what Chief Judge Jones did in that way. We have to assume here, as we assumed in the claims court, that what Chief Judge Jones did was within her jurisdiction to do. So I can't argue that one part of it was a taking and the other part of it wasn't. I can't argue that one part of it was within her jurisdiction and the other part of it was not. We're here arguing that everything that Chief Judge Jones did, she did pursuant to Congress authorizing her or actually giving her that authority to approve or not approve payments under the Criminal Justice Act. So it's all one and the same. Then if that's the case, don't you have a problem in that you agreed to operate under the Criminal Justice Act, which gives this full discretion to the Chief Judge to approve or not approve these budgets or these fee requests? The statute caps it at $3,000. That's correct. The statute gives a certain amount of discretion to the Chief Judge, but what happened resulted in a taking. And the statute doesn't say anything about taking. Well, that makes sense as though every time somebody receives less than the claim under the Criminal Justice Act, that that results in a takings claim. That doesn't make a lot of sense, does it? Well, I think a lot of what we have in this case, at least stemming from the Forrester decision... But isn't my statement correct that if you're right, every time someone receives less under the Criminal Justice Act, then he or she would like that that leads to a takings claim? Well, I mean, theoretically, if in every case the worker, whether it's a lawyer or whether it's an expert, is given less than what was budgeted and approved by the district court and forced to keep working with no promise of future payment, that sounds in taking. Not all these other decisions where someone receives... But you said there was no distinction between, in response to Judge O'Malley, says no distinction between the earlier invoices before the order to continue and the invoices afterwards. They're all the same. Then there was no order with respect to September, October, and November. And all you're saying with respect to those invoices is we didn't get what we thought we should. So that allows anybody who's dissatisfied to come in and say, well, it's a taking because I didn't get what I asked for. Well, my response to Judge O'Malley is more along the lines that I can't compartmentalize the order in that way. I can't divide it up into pieces that I believe were a taking and those which were not. I think that everything that happened vis-a-vis the chief judge and Markham was one action, all of which was done pursuant to the chief judge's authority under the Criminal Justice Act. All of it was together. And all of it resulted in the taking to Markham. And it was completely unjust the way that it happened. And if I can't pursue that taking... You don't seem to want to answer my question as to why your theory doesn't allow anybody who's dissatisfied with a CJA award to go into the Court of Federal Claims and sue for a taking. I mean, you may not want to answer the question, but it's a pretty pertinent question. I'm having difficulty because the hypothetical is asking me to assume a lot about all of these other cases that may arise at some point in time. I'm not familiar with those cases. What I'm familiar with is what happened to Markham. What I'm familiar with is that Markham was given far less than it expected, was forced to keep working through a trial with no promise of future payment. But that's not actually true. I mean, Chief Judge Jones did say, you'll still have the right to submit further invoices. So you knew there was some promise of something, you just didn't know what it was. I had the right to submit future vouchers. I had no idea if those were ever going to be paid. They were. They were. I mean, some amount was. But overall, what happened to Markham here, and hopefully the claims court will have the right to decide upon remand, is that what happened here was a taking, per se. And frankly, the government doesn't really even dispute that in its brief. The government is arguing here that the claims court lacks the subject matter jurisdiction to hear the case. So it takes no issue that we failed to state a cause of action as it relates to the takings claim. Thank you, Mr. Edelman. You have used all your time. We'll restore your rebuttal time. Thank you, Your Honor. And if you could give an extra three minutes to Mr. Sweet if he needs to use it. Thank you, Your Honor. Let me please the court. Your Honor is correct. This case is governed by Sharon. That case is binding on this panel and is positive. And what had happened procedurally in that case was almost identical to this case. The claimant in that case was dissatisfied with the CJAC decision. So they came to the Court of Federal Claims and tried to recast their CJAC challenge as a breach of contract claim. But it was a breach of contract. It was not. So she really was proceeding under the CJA, not as a takings. No, she was bringing an independent Court of Federal Claims breach of contract claim. Right. So there was no takings claim asserted. No, but under Vererda, it shows that you can't just characterize a claim as a takings and use that to challenge a decision. In the Vererda line of cases, those were also brought as takings claims. And the court said, no, then there's an alternative remedial scheme. You have to use that. And you can't use the takings clause to challenge a decision of another court, which is really what they're doing here. In order to consider their takings claim, this court necessarily has to challenge a decision as to what the reasonable fee was. And that's inappropriate. The CJA, as Sharon recognized... But there really is no remedial scheme, is there? I mean, it's totally discretionary. Well, it provides a standard. Yes, it has to be a reasonable fee, which is exactly what the Court of Federal Claims would be deciding. Was the fee reasonable? And Sharon, this court, recognized that that was a scheme to review and decide a CJA fee decision. But under the way that you argue the law works, Chief Judge Jones or any other chief judge could simply take some high-quality expert out there, and the minute they start working, they could say, okay, you're going to work for the next two years for the federal government, and you're going to get virtually nothing for doing so. You're going to catch them at $3,000. Those extreme cases are precisely what a writ of mandamus is for. For some crazy hypothetical where a judge goes off and says, you're going to work for years, and I'm going to pay you nothing. But short of those extreme cases, the statutory scheme that Congress designed was that the district court should decide the fees initially, and that should be reviewed by the chief judge. How much were they paid for December, January, and February? Your Honor, there's no allegations in the complaint. And in fact, we moved to dismiss their original complaint on those precise grounds, and they came back with vague allegations that they weren't paid about a million dollars overall. And I think that the Court of Federal Claims, in a footnote, indicated she had problems with the allegations regarding that still because they still haven't provided any indication as to how that post-November amount was calculated. Did you do any discovery to try to find out what they were paid or not paid? This is a motion to dismiss, Your Honor, it's before discovery. If you're asking what I personally did to find out, yeah, I contacted the clerk's office in the district court, and they couldn't find any particular order, which is what subsequently led to our moving to dismiss for failure to state a claim initially, and then they amended the claim. The district court had no evidence of what fees were authorized? No, Your Honor. And again, we sought clarification through our first motion to dismiss, and we still have nothing that they pointed to that the court did wrong except that one order, which is for up to November. And so looking at that order, that's clearly a decision of the court, and that's the only thing they've identified. Do you see a distinction between not paying someone everything they want and ordering them to continue to work when they want to resign? If anything, Your Honor, that's the latter is a more judicial decision, which it's even clearer there wouldn't be jurisdiction to review. That's something that should be resolved through the Fifth Circuit channel. How is a writ of mandamus to the Supreme Court a comprehensive scheme under the FJA? And if we don't have a comprehensive FJA scheme here, how does it preempt the Tucker Act? Comprehensive, as this Court recognized in Abbey, merely means the scheme provides all the relief that's available for a statutory decision. It doesn't mean you have to have all possible relief. And even more means the Supreme Court recognized that the scheme that Congress provides can be carefully circumscribed. Here, the scheme is carefully circumscribed. It provides for district court approver and then an alternative form of appellate review by the Chief Judge of the Circuit with the potential for mandamus. So if you look at the scheme in its entirety, it does provide a mechanism for reviewing and deciding CJA fees. And part of the problem Markham is having is they're trying to come in at the appellate stage and challenge that decision. But that, if anything, should be entitled to even more deference than if the district court had reduced the fee. Because you'd now not only have having the Article I court review a district court, but you're having it review a superior court of appeals judge. And indeed, I'd like to walk through exactly what the implications of Markham's claim would be by going through what would have happened had Markham or the Court of Federal Claims not dismissed this claim. Would Markham then be allowed to go down and take the deposition of Chief Judge Jones? And then would we call Chief Judge Jones before the Court of Federal Claims and have her testify that she thought the fee was reasonable? And then would we have Judge Horne, as good of a judge as she is, sit there and second guess Chief Judge Jones' testimony? And then would we have the threat of that hanging over any judge who ever reduced the CJA fee decision hanging out there? I think you've got better arguments than that. Well, I think we have a lot of good arguments, Your Honor. I'd agree with that. But I think this court has to consider the interference with sound judicial administration. That's ridiculous. It doesn't have to be conducted that way. Well, if it's not conducted that way, then it would be a simple appeal. And Markham is here arguing that this isn't appeal. But if they're not going to conduct any factual discovery and they're just going to do it on the record, then how is that any different than an appeal? It's not. And that's what Sharon recognized. You can try and characterize it as a takings claim or a breach of contract claim. But what they're really asking you to do is to second guess the Chief Judge's decision. And that's not an appropriate role for the court of federal claims. If Your Honors have no further questions, I just note that because the CJA can change the scheme for the reviewing and deciding of fees, that scheme and not the CJA has to be used to review and decide CJA fees. Thank you, Your Honor. Thank you, Mr. Sweet. Mr. Riddleman, we gave you three minutes. Thank you, Your Honor. Comprehensive means comprehensive. And a review scheme means that I have the opportunity to be heard. None of those things happened in any of the cases below. None of that was available when I submitted my vouchers to the district court. None of that was available when the district court submitted the vouchers to the Chief Judge of the circuit to be approved or not approved. And all of the cases that have interpreted the CJA in the sense of what sort of appellate rights or rights to be heard a provider has after it's negatively affected by an order, say that those cases are not appealable because the decisions at the time that are rendered are administrative. They're administrative in nature and they're not the subject of adversarial proceedings. And it's the administrative nature of the order that was rendered by Chief Judge Jones that A, resulted in the taking and B, gives the claims court the right to review it as a taking. Had the order that had been rendered by Chief Judge Jones been judicial in nature, had it been the result of a process of an adversarial hearing or something along those lines, anything that followed from it, any challenge to that order would have been an appeal. Was there any challenge that was made? I mean, I know you said that as to the September, October, November bills that you followed every route of an appeal and mandamus. Did you do that with respect to the remainder of the bills? There was counsel before my firm was retained, which pursued this case back to Chief Judge Jones, back to the Fifth Circuit, to the Supreme Court twice, once on a mandamus petition, once on a cert petition. So yes, all of those available... With respect to the December, January, and February bills, there was a writ of mandamus request? That's correct. It actually, I stand corrected. I believe it was an emergency petition for a stay of the Stanford criminal case. And we outlined those different... Right. So that relates to the show cause order and to the September, October, November bills. But was there another mandamus that was filed relating to the later bills? There was, relating to the later bills, there was a, excuse me, yes, there was. Where's that in the record? We outlined the different filings between pages 12 and 13 of the Blue Brief. There was a... I will admit that the procedural history of this case is a little bit confusing. But all of those... Do you have a final thought for us, Mr. Edelman? The decision that was rendered by Chief Judge Jones was administrative in nature. And as a result, the Claims Court has the right to review it as a taking. Thank you, Mr. Edelman. We'll take this case under advisement and that concludes our morning. Thank you. All rise. The Honorable Court is adjourned until tomorrow morning at 10 a.m. Thank you.